on the docket to 17-0650 on the salary of Logan Myers. Declarations was dated February 16, 2005. Are you on behalf of the plaintiff? Randy? Hey, just are you on behalf of the defendant? Good morning, Mr Johnson. Good morning, your honor's counsel, Randy Johnson and attorney Lauren Golden representing the plaintiff. Your honor, I want to talk about some, initially a couple of procedural aspects about this case. This was decided, or this, this 304 action appeal was decided on a motion to dismiss under 2615 of the code of civil procedure. There seems to be some type of a question as to whether, what the standard of review is, since that was raised by the appellee. We maintain respectfully, your honors, that the standard of review here is the de novo standard of review. The case cited by the appellees in support of that proposition was Phillips or against the proposition was Phillips versus DePaul. It was a 2014 case. However, we pointed out in paragraph 24 of that case, the court, in fact, did follow the de novo standard of review. And so we ask that the, that matter be clarified and that this court also follow the de novo standard of review. We've also cited the Illinois Supreme Court case, Marshall against Burger King, 2006 decision, which also holds that the proper standard of review in a 2615 review is the de novo standard. Mr. Johnson, thank you for that standard of review lesson. Let's talk about the case. First of all, how are you going to distinguish said lack? Your honor, the main, the main factual matter that distinguishes this case from Settle Chuck is the fact that in Settle Chuck, the plaintiff attempted to expand this alleged agreement to fix the, fix the problem from a dog that the tenant had, which was apparently originally a docile Labrador. And unbeknownst to everybody, it turned into a vicious Rottweiler, which what no one knew was vicious here. There was a, there was an attempted expansion of this issue from a non-vicious dog to a vicious dog. Is that what that case stands for? Doesn't it stand for the proposition that the landlord isn't liable by injuries caused by any dangerous or defective condition on the premises, leased to a tenant and under the tenant's control? How was the dog in this case under the landlord's control or how did the landlord owe a duty to that individual walking by? In this situation, contrary to that in Settle Chuck, at, yeah, I think it's counting off page 81, it was clear that this landlord knew that this dog in this situation was a vicious dog. In our case or in Settle Chuck? In this case. In this case. And, and was well aware of the problem because this dog had attacked and gotten off the premises previously, which was not the case in Settle Chuck. In Settle Chuck was the, was the landlord supposed to repair the property? And in this case, there was only a promise to reimburse for repairing the property. That's correct, Your Honor. But we take the position that the two agreements essentially are rather indistinguishable, particularly when you get to the position in this case that the landlord knew this dog was vicious. This landlord knew of the problem. It's like this landlord knew that this tenant was going to, was operating a blasting unit on the land. But you know, if we analyze this and look at the voluntary undertaking here and the promise that was made, the promise has Justice Shostak alluded to was to reimburse the tenant for the repair of the fence. So regardless of whether the landlord knew or didn't know, that was the undertaking. Now, isn't it correct that the condition preceding to that reimbursement was never completed? That is the fence was never repaired so that the obligation of the landlord to reimburse never really became operative. Well, that certainly isn't one way to look at the facts. We would prefer to look at the facts as saying there was an agreement here and the purpose of the agreement was to fix this fence. But you're not saying that was, you're saying that was a voluntary undertaking or it wasn't? So in other words, the landlord expected because the landlord was on notice that this dog was vicious to begin with prior to this discussion, the landlord expected that this tenant was going to fix the fence, told him to fix the fence apparently and said, listen, I'll reimburse you. And the purpose of that was to protect people outside the current bench from this vicious dog. So when the fence wasn't repaired, then what should have happened? I think it's just another factor indicating the negligence on the part of the landlord. That he didn't force the tenant to repair the fence? That he never followed through on what was going on out there when he knew that this dog was on the premises and was vicious. But don't we have to construe a voluntary undertaking very narrowly? I mean, you're, you're construing it very broadly in what you just described. Your Honor, it has to be construed narrowly, but it has to be construed in accordance with the purposes of the law and purposes of agreements. And the purpose of this agreement between this tenant and this landlord, which has to be accepted as true under 2615 on a motion to dismiss, the agreement here, the purpose of this was to keep that dog confined. And the purpose of it failed. So then from there, the failure to follow through, therein lies the duty to a third person walking by. It's not on the landlord's property. It certainly would under a traditional tort analysis. That's a good point that you make, because did you, did you argue a traditional court analysis? I mean, did you fork at that? Your Honor, I concede that the traditional tort analysis under Stearns and under Simpkins was not presented to the trial court. Right. And that's why we're taking the position before you, Your Honors, it's so important of the de novo review in this court acting in place of the trial court. And also, Your Honor, to hit the, hit the waiver argument that was presented by the Appellee head on. Certainly while it may be a limitation in parties, it's not a limitation on this court to do what's right and to do what's just. And on that, on that basis, we would ask the court not to strictly enforce the waiver doctrine. There's certainly, certainly the issue of duty was before the trial court and the trial court specifically without any distinguishing features on the Sedlicek case, to this case, followed Sedlicek completely. You talk about duties that there are courts have recognized for affirmative duties to protect others from unreasonable harm. Is the landlord and general public included in any of those four duties? I believe the landlord is, Your Honor, because the landlord is a member of the public like anyone else. And it's our position that the laws ought to be equally applied to whomever is operating in the situation. And that's why we urge the court in our position here to apply the additional tort principles in order to run the duty analysis. Because you see, landlords, there's no special immunity for landlords. There's no statutory immunity. Why shouldn't they be treated like anyone else? But being treated by anyone else, we have to get back to how that happens. And that is, I believe, according to what your theory is, via a voluntary undertaking. And so, I mean, I think the challenge is to see what that voluntary undertaking really was and whether or not it had been abandoned. I mean, there were a number of months that went by. You're absolutely right, Your Honor. And that brings me to the next point. The court, the trial court here, decided a factual question without the benefit of an evidentiary hearing. What's the actual question? The agreement. Oh, this agreement was no good. What do you mean it was no good? The agreement alleged, the agreement alleged. To reimburse. Pardon me? The agreement to reimburse? Yes. Okay. Yeah. You mean it was no longer in effect? Is that what you were just explaining to us? Precisely. That's exactly what the trial court found. This is, well, this never happened. So this is some vague thing and we're not going to do it. This is a factual determination on a 2615 motion that the trial court should not have made. This is a factual determination that should have gone to a trial for a fact. Instead, this count got dismissed. That's very problematic. When you start blending factual questions with questions of law, and then you just start, then the court starts deciding factual questions in that context with hearing no evidence in a motion that the court is supposed to assume is true, all well pleaded facts. Did you, in your response, did you suggest that the agreement remained in effect? In your response to the 2615? Your Honor, we never had an opportunity because... You didn't file a written response to the 2615? I believe, sure, we did. And that's my point. And in that, did you suggest that this agreement was still valid and waiting to be completed? I believe we did, Your Honor. I believe we did. We certainly wouldn't have abandoned the issue of validity of this agreement. And frankly, the trial court took that off the table in deciding that factual issue in the course, in the process of analyzing what it was going to do on this motion to dismiss. And it's interesting, as far as this traditional duty analysis, it begins with a threshold question. Whether the defendant, by act or omission, did something to contribute to the risk of harm to a particular plaintiff. And the Supreme Court has noted that this particular plaintiff doesn't have to be identified. And then the court goes through the four elements in deciding the question. And only after, only after, if the answer to the threshold question is no, then you get to the special relationship issues. The special relationship issues like, are you a landlord, are you a tenant, are you an invitee, are you this, are you that, that doesn't get ever decided, even looked at in the traditional analysis, unless the threshold question identified, the defendant by his act or omission, has done something to contribute to the risk of harm to this plaintiff. In this particular case, the case we have here, that's exactly what the landlord did. You know, I think it's fair to say that really what the landlord did was never pursue whether or not the tenant wanted to be paid back. Paid back for having, paid back for repairing. My point is, the absence of you giving me a bill for the repair of the fence doesn't mean the fence wasn't repaired. It means you never gave me a bill. It still potentially could be described as an omission. But how far out do we go to assign duty? Your Honor, that's, that's, that's the classic, that's the classic problem going back to Paul's Railway and Andrew's. I know, but you're on that side. You have to come up with the answer, I come up with the questions. Andrew's, I use the answer, Your Honor. Your Honor, in this particular case, I don't think it's unreasonable to go so far as to say a duty should be imposed. The landlord knew this dog was vicious and had gotten out before, had bitten somebody before. Was this foreseeable? Absolutely. Absolutely foreseeable. Otherwise, there never even would have been a discussion between the landlord and the tenant about this issue. The problem is, is, do you have a case that, that supports that theory? Because, again, this is, I, I pronounce it Sadler Check case. I think there's another case, Bayer case, that says a lessor who relinquishes control of a property to a lessee owes no duty to a third party who is injured while in the leased property. So that's while in the leased property. How do we carry it out when he's not even on the leased property? So we're going one step further. If you can find a case to that effect. If I can please answer, Your Honor, despite the time. I think, I think that the mayor, first of all, as far as a case coming, coming close, close but not exactly on point is the Nevada case that we cited in the task force, task force brief. Again, it's not binding authority. It's only persuading, contend it's persuasive authority. And the other issue is how far do we go? How, how, where do you bring this duty? You bring it really to foreseeability. It was foreseeable here. The landlord knew this dog was vicious. That's how far the court should bring it. With all due respect, we all... I had one other question. I'm sorry, Your Honor. I know you have time for reply, but it's close to one of the points that you were making. When you were talking about the general negligence analysis and urged us to use it, and then you said that you felt that the landlord fell within the category of relationships that would be general public. No, I... Yes. But, but looking at this a little more closely, among the four relationships that give rise to this affirmative duty to aid or protect another against the risk of harm, isn't this last category a possessor of land who holds it open to the public and member of the public who enters in response to the possessor's invitation? Now, how does that, I'm, I'm not following. If that really is the description, how, where does the landlord in this case fit in? I mean, possessor of land who holds it open to the public. Not, not here. Your Honor, first we, as far as this threshold question and the four factors determining duty, we cited that on page nine in our brief, and we don't, we maintain that we don't even get to the relationship prior to the, those, those four factors being determined. I see. However... Okay. I suppose, by omission, when this landlord knew he had a vicious dog on his property and knew that there was, that the fence was broken like a sieve, that's not the logical stretch to say that he held this open to the public, certainly the public of our client walking along that sidewalk. He held it open to, because that fence was in total disrepair. Okay. Thank you. Your Honor, respectfully, we ask the court to reverse and remand this matter for trial. Thank you. We don't have time for a rebuttal. Mr. Elson. Good morning, Your Honor. Good morning, sir. I have to say, I've never set foot in an appellate court before. I appreciate the opportunity. It's my pleasure. You're welcome. I'm Justin Jorgensen, and I recall in earlier days, I served in DuPage County there once in a while. It's a pleasure being here this morning. Thank you, counsel. I represent the defendant appellees, Rickowski, and my argument on their behalf has always been a simple one. It still remains a simple one. I'm going to interrupt for one second and ask if you'd take a step to your left and be in front of the microphone because we do have a couple people in the back we need to hear also. Please keep your voice up, sir. Thank you. Is that okay? Yes. All right. My argument is and has always been a relatively simple one based on the pertinent case law, the Saddler-Shack or Saddler-Sack case in particular, that per the allegations of the complaint, my client undertook a voluntary obligation to reimburse the tenant for the repairs to the fence. In this particular case, the repairs were never done, obviously, because the plaintiff was injured. So it's our position that my client's obligation under any such voluntary undertaking never came to fruition and, therefore, there's not any potential liability. Well, how do you respond to what Mr. Johnson is saying, that the landlord knew of the vicious nature of this dog yet did nothing to follow through or follow up with the repair of that fence? Well, the Saddler-Sack case indicates that generally the tenant is on the least premises and there's not any potential liability if the landlord simply acquiesces to a dangerous condition on the least premises, which is, in effect, what we have here. The Saddler-Sack case favorably cited a couple of Nevada cases, Wright v. Shum in particular, and distinguished those cases, however. In the Wright case, the landlord was found potentially liable because after complaints about the tenant's dog, the landlord told the tenant to keep the dog in the house or on a chain when outside and threatened eviction. And the court determined in that case, because the landlord took, quote, affirmative action, close quote, to do something about the dog situation, in effect sought to control the tenant's actions with regard to the dog issue, there was potential liability. So the court held the landlord had voluntarily undertaken a legal obligation to protect the plaintiff in that case from the tenant's dog by trying to remedy the dog problem before the minor plaintiff in the Wright case was injured by the tenant's dog. In this particular case, there hasn't been any such affirmative action alleged by my clients to render them potentially liable to the plaintiff. It's alleged only that my clients agreed to reimburse the tenant for the repairs and defenses, as we said before, if and when, evidently at his discretion, the tenant saw fit to do so. Tenant never did that. Our obligation never came to fruition. There's not any potential liability. The burden in our case of taking any affirmative action to protect the plaintiff in the case from potential injury was on the tenant and not on my client. Think of it this way. If the tenant had, in our case, had repaired the fence and my client didn't pay him or reimbursed for the repairs, the tenant may well have a contract action against my client, but certainly the plaintiff in the case would not have a tort action against my client. So any way you look at it, whether my client did not reimburse the tenant for the repairs because they weren't done, or if the tenant had performed the repairs but my client didn't pay, there's not any potential liability in this case on the part of my client. How about our traditional duty analysis? Traditional duty analysis, I think, first of all, the one case that the plaintiff cited for that proposition was Stern v. Ridge Ambulance. In that particular case, summary judgment was upheld in favor of the plaintiff's nursing home, excuse me, summary judgment in favor of the plaintiff's nursing home was reversed when the plaintiff was injured by an ambulance service returning her to her nursing home from a dialysis center. And the court ruled in that particular case that there was potential liability because, as has been discussed previously with my opponent, there was a special custodial relationship as between the plaintiff and the defendant nursing home. In this particular case, the plaintiff was not alleged the presence of any such custodial relationship. And as the court noted, with regard to those relationships, the only one it talks about relative to possessors of land is if the land was open to the public, which was not the situation here. So, again, it boils down to the duty of care of the plaintiff in our case was solely that of the tenant, I suggest, and not that of my client. Now, the Simpkins case, which was cited by my opponent as well in the brief, says that the duty analysis must begin with the threshold question of whether the defendant by his act or omission contributed to a risk of harm to the plaintiff. And I suggest the answer to that question in our case, all things considered, must be no. In the Simpkins case, upon which the appellees relied for the most part, it was indicated that generally the tenant is responsible for maintenance of the lease premises. The only exception pertinent to the Simpkins case, potentially, is when the landlord makes a voluntary promise at the time of the release to repair a condition. And as I mentioned, Sedlicek cited favorably a couple of Nevada cases, Wright and Wiseman, in which cases held a landlord may be liable to third parties only if the landlord takes, quote-unquote, affirmative action to assume a duty to protect third parties. There is not any potential liability if a landlord simply acquiesces to a dangerous condition on the leased premises. The landlord's obligation pursuant to a voluntary undertaking, as the Court has already indicated, is limited to the extent of the undertaking. And that obligation is to be narrowly construed by law. And I suggest it's be narrowly construed because it's an obligation that is self-assumed. It's not one imposed by law. And therefore, it is to be narrowly construed. Now, it's alleged in this case that all my clients did was promise to reimburse the tenant if and when the tenant repaired the fence. In other words, there was not any alleged specific promise, quote-unquote, as required by Sedlicek by my clients to repair the fence. The burden was on the tenant to repair the fence. Since the tenant never repaired the fence, my client's obligation to reimburse the tenant never came to fruition. And as mentioned, if the tenant repaired the fence, we can presume the plaintiff would not have been injured by the tenant's dog in this particular case, whether my client reimbursed the tenant thereafter or not. And again, this scenario shows that my client's alleged promise to reimburse the tenant for the fence repairs legally did not have anything to do with the plaintiff's claims injuries, did not impose any duty of care to the plaintiff. It's not alleged in this case in the complaint issue that my clients took any, quote-unquote, affirmative action to force the tenant to repair the fence or to do something with his dog to stop it from getting out of the yard. In other words, it's not alleged that my clients did anything to exert control over the actions of the tenant with respect to the condition of the fence or the tenant's dog, unlike the situation in the Nevada Wright case in which there was potential liability found for that reason as to the landlord. And in Sethlesack, at the end of the case, that court noted that even the landlord telling the dog owner tenants to, quote-unquote, get rid of their potentially dangerous rottweiler once they discover the tenant had a rottweiler in addition to the Labrador in a footnote, the court says, of course, quote-unquote, this did not amount to a promise or an undertaking to do anything at all about the dog, much less protect others from it. So I suggest that my clients' benign promise simply to reimburse the tenant for any repairs to the fence likewise does not rise to the level of an undertaking to have done anything about the tenant's dog or the fence, much less protect the plaintiff in this case from harm which befell her because of the tenant's dog. Therefore, I suggest the trial court was correct in dismissing the plaintiff's Third Amendment complaint with prejudice. The plaintiff never asked for leave to file a Fourth Amendment, which infers she didn't have anything to add to her complaint to state a viable cause of action against my clients. And instead, the plaintiff moved for a Supreme Court Rule 304A finding to appeal that dismissal, and I would ask this Court to affirm that trial court's dismissal of the Third Amendment complaint with prejudice. Counsel, what about opposing Counsel's argument with respect to foreseeability under the traditional duty analysis? He argued pretty strenuously that it was this landlord's duty to foresee what happened because of the vicious nature of this dog. I think as I mentioned before, the Sedlice case I think covers the traditional duty analysis or addresses it when they set forth within the case that the proposition that generally the tenant is responsible only for maintenance of the leased premises. The only exception as I mentioned pertinent to this case might be when the landlord makes a voluntary promise at the time of the release to repair the lease, rather, to repair the condition. And the Court specifically said there's not any potential liability if a landlord simply acquiesces to a dangerous condition on the leased premises. So just knowing that there's potentially a dangerous dog on the premises without taking that affirmative action, as some of the other cases state, does not impose liability. That's what they're trying to say. But they never allege that my client took any affirmative action to control the tenant's actions, to threaten eviction, as in the Nevada cases, to keep the dog chained, to keep the dog in a house. All that we did was say, look, if you repair the fence, we'll reimburse you for the repairs. I suggest that doesn't rise to the level of a duty of caring for clients. Is that a good policy position? Excuse me, Judge? Is that a good policy position? To encourage, if we accept your analysis of the law, we encourage a landlord to say, see no evil, speak no evil, seek to fix no evil. And is that a good policy position? Well, I think the 2nd District thinks it's a good policy position based on the Sobocek case. I would agree with that. And I think it's generally a good policy position. And Sobocek, I believe even brings this out. Who's in the best position to remedy the situation? Who's in control of the premises? The tenant. If there's an issue there, the tenant is the one in the best position to make the repairs, in this particular case, to maintain control over his own animal. And the cases, Sobocek in particular specifically says, they're not inclined to extend liability to injuries from a tenant's animal that occur off-premises, just like in this particular case. If it was on-premises, I don't know, maybe there would be a different result, but I don't think so. Thank you very much. Your Honors, I'll make only a couple comments in rebuttal. First of all, in Sobocek, paragraph 31, the Court said, although the defendant arguably crimes to fix the fence in part to contain the Raymond's friendly Labrador, which under the beliefs they were authorized to keep, defendant cannot be said to have assumed the duty to contain a dangerous dog that the Raymonds would go on to keep in violation of the lease. Where were the violations of the lease here? Your Honor, I don't think that the lease in this case, in our case, was ever admitted into evidence, other than the fact that there was a Whose burden would that have been? Your Honor, I think if the defendant wants to defend on the basis of, well, we have a contract with this tenant, that would seem to be the burden that would be on the landlord. You just raised the issue of violation of the lease in that particular case, so you're raising the issue of the lease, so if that's what you're talking about, wouldn't you want to put the lease into evidence? I would assume so. I just wanted to cite that section of the Sobocek decision, only to notify the Court that the landlord in that case had no knowledge of this vicious dog, which is a critical contrast to the case at Barra. And because of that, the best person to remedy the problem here, based upon the landlord's previous knowledge, was the landlord, not the tenant. But he gave that responsibility to your client, and your client said, I'll fix it, and then Not my client. My client was the passerby that got the dog. I'm sorry. You're correct. He gave that responsibility to the tenant who said, I'll take that on, and I'll fix it, and then I'll ask you to reimburse Correct. And the underlying purpose of that was to fix the fence and hold in the vicious dog. And that was the purpose of it. And I respectfully appoint to the Court the citation out of Simpkins that was cited in Stearns about generally individuals and businesses do not owe on the firm of the duty to protect or rescue a stranger. However, this Court has long recognized that every person owes a duty of ordinary care to all others to guard against injuries which naturally flow as a reasonably probable and foreseeable consequence of an act. And such a duty does not depend upon contract, privity of interests, or the proximity of relationship that extends to remote and unknown persons. That's what the law is on duty. That's why this defendant should not have been allowed to escape this. On a 2615 motion, it should have gone to a hearing, a factual hearing, and been tried to a trial of facts. Your Honors, I respectfully ask the Court to reverse. Thank you very much, Counsel. The Court will take the matter under advisement and render a decision in due course.